UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MELISSA A. KORPACZ, JD ) <br> NEW ENGLAND STORM, LLC ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> WOMEN'S PROFESSIONAL FOOTBALL LEAGUE ("WPFL") ) <br> LONG BEACH AFTERSHOCK, LLC ) <br> THE TOLEDO REIGN ) <br> DELAWARE GRIFFINS, INC. ) <br> DAYTON REBELLION ) <br> SYRACUSE STING, INC. ) <br> HOUSTON ENERGY FOOTBALL, INC. ) <br> ARIZONA CALIENTE, LLC ) <br> INDIANA SPEED, LLC ) <br> MISSOURI AVENGERS ) <br> MINNESOTA VIXEN, INC. ) <br> DALLAS DIAMONDS, LLC ) <br> NEW YORK DAZZLES, LLC ) <br> LOS ANGELES AMAZONS, INC. ) <br> SOTHERN CALIFORNIA SCORPIONS, LLC ) <br> ) <br> Defendants. ) | CIVIL ACTION <br> NO: 04-10735-RWZ |

## AMENDED COMPLAINT

This is an action by Plaintiff Melissa A. Korpacz ("Korpacz") and Plaintiff New England Storm, LLC ("Storm") (collectively "Plaintiffs") for false designation of origin and affiliation under Section 43 of the Lanham Act, 15 U.S.C. § 1125(a), breach of contract, defamation, tortuous interference with advantageous relationships, tortuous interference with contractual relationships, conversion, and unfair and deceptive business practices against the Women's Professional Football League (hereinafter "WPFL"), and fourteen former Associate Teams within the WPFL, namely, Defendants Long Beach Aftershock ("AFTERSHOCK"), The Toledo Reign ("REIGN"), Delaware Griffins ("GRIFFINS"), Syracuse Sting ("STING"), Houston Energy Football, Inc. ("ENERGY"), Indiana Speed ("SPEED"), Missouri Avengers ("AVENGERS"), Minnesota Vixens ("VIXENS"),

1

Dallas Diamonds ("DIAMONDS"), New York Dazzle Football ("DAZZLE"), Defendants Arizona Caliente ("CALIENTE"), Defendants Thee Toledo Reign ("REIGN"), Los Angeles Amazons ("AMAZONS"), and Southern California Scorpions ("SCORPIONS") (collectively "Associate Team Defendants").

## PARTIES

1. Plaintiff Storm is a Rhode Island limited liability company, qualified to do business in the Commonwealth of Massachusetts, with a principal place of business at P.O. Box 808, Medford, MA 02155.

2. Plaintiff Korpacz is (1) a Massachusetts resident; (2) 100% owner of Plaintiff Storm; (3) a Founding Member of the WPFL; (4) the holder of a lifetime Member License agreement/contract with the WPFL for her team Plaintiff Storm; (5) Vice President of WPFL Promotions, LLC; (6) Governor One of the WPFL as listed on the Articles of Incorporation and (7) beneficiary of the WPFL Irrevocable Trust.

3. Defendant WPFL is a Houston, Texas company, with a place of business at 5631 Dorbrandt Street, Houston, Texas.

4. Defendant AFTERSHOCK is a California company, with a place of business at 1827 Ximeno Avenue, # 208, Long Beach, California.

5. Defendant REIGN is an Ohio company with a place of business at 17864 WSR 105, Elmore, Ohio.

6. Defendant GRIFFINS is a Delaware company, with a place of business at 2731 Duncan Road, Wilmington, Delaware.

7. Defendant REBELLION is an Ohio company, with a place of business at 863 East 3rd Street, Xenia, Ohio.

2

8. Defendant STING is a New York company, with a place of business at 407 North Wolcott, Syracuse, New York.

9. Defendant ENERGY is a Texas company, with a place of business at 1531 Dorbrandt Street, Houston, Texas.

10. Defendant CALIENTE is a Arizona company, with a place of business at 15261 North 61st Drive Glendale, Arizona.

11. Defendant SPEED is a Indiana company, with a place of business at 6715 North County Road, 625 East, Brownsburg, Indiana.

12. Defendant AVENGERS is a Missouri company, with a place of business at 2847 South Weaver Avenue, Springfield, Missouri.

13. Defendant VIXEN is a Minnesota company, with a place of business at 500 North Robert Street, St. Paul, Minnesota.

14. Defendant DIAMONDS is a Texas company, with a place of business at 232 Belmont, Hurst, Texas.

15. Defendant DAZZLES is a New York company, with a place of business at 305 Madison Avenue, Suite 449, New York, New York.

16. Defendant AMAZONS is a California company, with a place of business at 1992 Juanita Avenue, Pasadena, California.

17. Defendant SCORPIONS is a California company, with a place of business at P.O. Box 22809 San Diego, California.

## JURISDICTION AND VENUE

18. The Court has personal jurisdiction over all Defendants pursuant to 28 U.S.C. § 1391 because they availed themselves to this Court by: (1) doing business in Massachusetts, (2) causing harm to Plaintiff Korpacz and Plaintiff Storm in Massachusetts, and (3) filing Defendants' Motion

to Dismiss without raising the defenses of personal jurisdiction and improper venue.

19. This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1338(a) as this action involves a claim relating to trademarks and under 28 U.S.C § the parties are of diverse citizenship and the claimed damages well exceed $75,000.00.

## FACTS APPLICABLE TO ALL COUNTS

20. In March 2001, Plaintiff Korpacz, Dee Kennamer (hereinafter "Kennamer") and Robin Howington (hereinafter "Howington")(hereinafter collectively "the WPFL Founding Members") held a meeting in Boston, Massachusetts and began operating as the sole owners of Defendant WPFL. The WPFL is the longest running women's professional full contact football league in the United States, which has expanded from three teams in 2001 the (Founding Member Teams including Plaintiff Storm) to 18 teams in 2003.

21. The WPFL Founding Members created three separate entities: (1) the WPFL Trust, (2) WPFL Promotions, LLC ("WPFL Promotions") and (3) the WPFL. The WPFL itself is a non-profit entity granting teams the right to play football within certain WPFL territories. The WPFL Trust is an instrument, of which the WPFL Founding Members are beneficiaries, along with all Member Teams who enter the WPFL. WPFL Promotions has an irrevocable contract with the WPFL to exclusively provide all of its media and marketing on a national scale.

22. The WPFL Founding Members created two separate team affiliations with the WPFL for incoming teams (1) Member Team Affiliation and (2) Associate Team Affiliation. Member Teams are required to pay a fee of $25,000.00 (as determined by the Member Teams), and (1) receive lifetime membership and protected territory rights in the WPFL, and (2) become beneficiaries of the WPFL Trust. Associate Teams (1) are required to pay an annual fee prior to the start of each season as determined by the Board and (2) their territory is only protected for one year and they must renew their contract with the WPFL each year if they are extended an offer to

4

participate.

23. The WPFL Founding Members were each issued and signed their Founding Member Team License Agreements granting each of them lifetime membership in the WPFL for their prospective teams and each received 750,000 units in WPFL Promotions.

24. Plaintiff Korpacz was appointed the Executive Director of the WPFL and the Vice President of WPFL Promotions. Plaintiff Korpacz was the primary marketing executive for the WPFL and WPFL Promotions from 2001, until her unlawful expulsion from the WPFL, as hereinafter alleged, Plaintiff Korpacz, up until March 6, 2004, worked exclusively for the WPFL trying to secure national sponsors for the league.

25. In 2001, in order to guide and instruct newly recruited teams in the development of running a WPFL team to the standards of the WPFL, Plaintiff Korpacz created the "WPFL Binder".

26. In addition, the majority of documents, trademarks, logo and concepts contained the WPFL Binder were the exclusive creation and property of Plaintiff Korpacz. Between 2001 and the present, copies of the WPFL Binder were delivered to each new team owner upon entry into the WPFL. On the front page of the WPFL Binder, there is a "Confidentiality Agreement" which states that the Binder belongs to the WPFL, specifically to "Melissa A. Korpacz, Dee Kennamer and Robin Howington."

27. In early 2000 Plaintiff Korpacz' marketing firm, Hill Holiday of Boston, MA, designed slogans, logos, trademarks, commercial proposals, posters, and a branding campaign with concepts specifically for Plaintiff Storm. These items designed for Plaintiff Korpacz by her marketing firm, have been included in the WPFL Binders.

28. Defendant WPFL and the Associate Team Defendants have used the Plaintiff Korpacz' slogans, logos, posters and trademarks, commercial proposals and concepts through the 2003 season and continue to use them to date without permission from Plaintiff Korpacz including but not

5

limited to the slogan "Its Our Turn To Play" and the printed "football eyes" logo.

29. Plaintiff Korpacz did not give up nor agree to relinquish her exclusive rights to these items of intellectual property but simply allowed the WPFL and Associate Team Defendants to use that property while she and her team, Plaintiff Storm, and the Associate Team Defendants were legally associated with the league.

30. In early 2001, Plaintiff Korpacz' Boston marketing firm, Hill Holiday, completed the production and editing of four commercials as part of the aforementioned branding campaign. For the following three years, these commercials were given to each team entering in the WPFL (at no cost) as a courtesy by Plaintiff Korpacz to assist the incoming teams in soliciting sponsors as well as to demonstrate the caliber of team the WPFL was desiring.

31. In March of 2001 at the semi-annual owners meeting held in Houston, Texas, incoming teams were given Plaintiff Korpacz' WPFL Binder.

32. On January 17, 2002, Plaintiff Korpacz, Kennamer and Howington held a WPFL Board meeting to ratify the WPFL Organization Agreement, accept Articles of Incorporation, and affirmed the Constitution and Bylaws of the WPFL. Kennamer signed minutes relating to said meeting.

33. On March 8, 2002, Plaintiff Korpacz, Kennamer and Howington signed the Constitution and Bylaws of the WPFL.

34. In October of 2002, Plaintiff Storm failed to show for a game in Syracuse, NY against Defendant STING. This failure to show was not due to financial issues, rather players' refusal to travel after a 1-9 season. Due to this violation of the Bylaws, Plaintiff Korpacz was issued a $10,000 fine by the WPFL Board of Directors, with payment options subject to negotiation with Defendant STING.

35. On or about December 15, 2002, Plaintiff Korpacz attempted to begin negotiations with the Syracuse Sting to pay the $10,000 fine.

36. On or about December 18, 2002 Howington interfered with negotiations between Plaintiff Korpacz and Defendant STING regarding the terms of the $10,000.00 fine.

37. On or about March 1, 2003, during a conference meeting, the WPFL Board of Directors at the urging of Howington, voted and issued a fine of $5,000 cash against Plaintiff Storm and instructed Plaintiff Korpacz to turn over 5,000 units of WPFL Promotions which she held individually to satisfy the fine. This directive was never placed in writing to Plaintiff Korpacz.

38. At the March 1, 2003 meeting, the WPFL Board of Directors hired Lisa Vessey ("Vessey") as Commissioner of the WPFL. Vessey is an attorney in private practice in Illinois.

39. Immediately after accepting the Commissioner position, Vessey began a pattern of violating the WPFL Bylaws, Policies & Procedures Manual, fair business practices and federal law as they related to Plaintiff Korpacz and Plaintiff Storm. Despite repeated requests by Plaintiffs to intervene, the WPFL Board of Directors condoned and approved all of the violations.

40. After expelling the Wisconsin Rivers, an Associate Team, from the WPFL in April, 2003, the WPFL Board of Directors voted to limit Associate Team contracts to expire on December 31st of each year. The original Associate Teams were instructed to sign new contracts.

41. In accordance with the fine levied above for failure to show for the STING game, Plaintiff Korpacz paid Defendant STING 5000 units of WPFL Promotions shares belonging to Plaintiff Korpacz individually plus a cash monetary fine of $5,000.00.

42. On May 1, 2003, the WPFL Board agreed by Consent to Action to allow Plaintiff Korpacz until May 30th to pay the full $5,000.000 cash fine with a daily penalty of $10.00 per day from April 15 – May 19. The penalty was increased to $25.00 per day from May 20th – May 30th.

43. Even though Plaintiff Korpacz had paid her $1,500 license fee for 2003 due on May 1st, Plaintiff Korpacz received an email from Commissioner Vessey on May 16, 2003 indicating that the Plaintiff Storm was suspended from the WPFL not paying the license fee and that Plaintiff Korpacz

7

had 10 days to pay it in order to return to good standing.

44. The WPFL Bylaws define Teams in Good Standing as "those Teams that are no more than $2,500 in arrears in any dues, assessments, or monetary sums owing to the WPFL."

45. Plaintiff Korpacz provided Commissioner Vessey with proof of mailing, showing that the license fee had in fact been sent on April 29, 2003. Vessey rejected the proof of mailing although the US Postal Service certified it.

46. On May 23, 2003, Plaintiff Korpacz emailed Vessey again and asked for a release from the suspension as the fee had been paid at the time of her email.

47. On Monday May 26, 2003 Plaintiff Korpacz received a response email from Vessey indicating that the suspension of Plaintiff Storm would continue until the May 30th $5000 fine and per diem penalties were paid in full. This was a unilateral decision made by Vessey with no authority from either the WPFL Board of Directors or the Bylaws to hold over the suspension.

48. On May 30, 2003, Plaintiff Korpacz wired the full fine and penalty amount of $5,585.00 into the WPFL account. Plaintiff Korpacz submitted an email to Vessey asking her to lift the suspension as she had fully complied. Plaintiff Korpacz received no response from Vessey.

49. On June 3, 2003 Plaintiff Korpacz received a phone call from Vessey indicating that Plaintiff was suspended from the WPFL indefinitely for the following reasons: (1) allegedly having an outstanding invoice with officials from the previous season, (2) allegedly because Plaintiff Storm's General Manager had been replaced by two additional Team Managers, and (3) allegedly because Plaintiff Korpacz owed money to its venue stadium.

50. Per the WPFL Bylaws, telephone notice is not a proper means of notification of a suspension, and Plaintiff Korpacz never received proper written notice.

51. On June 4, 2003, Plaintiff Korpacz had a phone conference with Vessey and Kennamer as Director of Football Operations. Also present were Plaintiff Korpacz', Head Coach and

Plaintiffs' Assistant.

52. Plaintiff Korpacz was told by Vessey that she needed to produce evidence to Vessey's satisfaction that Plaintiff Korpacz was financially able to " pull off the season." The verbal demands set forth on June 4th by Vessey were as follows: (1) Plaintiff Korpacz must send $4,000.00 to the WPFL no later than Friday, June 6, 2003, to be placed in an escrow account to ensure that Plaintiff Storm will show up for their games, (2) Plaintiff Korpacz must pay officials by Friday, June 6, 2003, (3) Plaintiff Korpacz must execute a General Manager's contract with Erich Kennedy, one of Plaintiff Korpacz' current Team Managers, and (4) Plaintiff Korpacz must submit by June 6, 2003, an affidavit with her outstanding invoices showing that they are paid in full.

53. Additionally, Vessey told Plaintiff Korpacz that there were two WPFL schedules for the 2003 season, one with Plaintiff Storm and one without. Vessey told plaintiff Korpacz that if verbal demands set forth in the prior paragraph were not timely complied with, the WPFL schedule would be released without Plaintiff Storm on it.

54. Vessey's verbal demands gave Plaintiff Korpacz less than 48 hours to comply. Vessey's demands were a violation of the WPFL Appeal Process as defined in the WPFL Bylaws. The WPFL Bylaws, Article V, indicate, "Within ten (10) days of notice, anyone may appeal an action by the Commissioner." However, even prior to receiving an appeal, per the WPFL Bylaws, Plaintiffs should have been given proper notice, an opportunity to respond within the specified time, etc. Plaintiffs were never provided with such an opportunity.

55. Vessey stated to Plaintiff Korpacz that she would not call for a meeting, a hearing, a conference call, etc. Accordingly, Plaintiff Korpacz without any alternative contacted as many WPFL Board members as she could within the time frame seeking relief from Vessey's demands. Vessey would later turn this into Plaintiff Korpacz' attempt to "wage a campaign of retaliation against her."

9

56. Per the WPFL Bylaws, Plaintiff Korpacz was denied proper notice, adequate time to respond, a hearing or 10 days to appeal Vessey's decision.

57. Out of fear that Vessey would in fact issue the schedule without Plaintiff Storm on it, on June 5, 2003, Plaintiff Korpacz complied with Vessey's demands to the best of her ability in that she: (1) made payment to Kennamer of $1,000, (2) made payment to Berndt of $3,000, (3) made payment to officials of $2,200, (4) made payment of $4,000.00 to WPFL account, (5) sent an apology letter to Vessey as requested by Kennamer, (6) executed General Manager Contract, (7) sent a letter from the team's General Manager indicating commitment, (8) sent an outline of outstanding bills and agreements/plans for payment.

58. In response to the above good faith effort by Plaintiff Korpacz, Vessey issued a ruling which, in substance, stated that: "…the suspension of the New England Storm, as a team, is lifted, but that " due to a pattern of misconduct on the part of Owner Missi Korpacz that is detrimental to the WPFL and women's professional football, Owner Missi Korpacz will be suspended for not less than four games… (8) that the details of the suspension and the enforcement procedures will be set forth in a separate official notice to follow next week."  Up until that point, Vessey had never met Plaintiff Korpacz and there were no Board minutes to reflect a "pattern of conduct".

59. Nevertheless, Vessey failed to follow through on her "details of suspension" in the following week.  Plaintiff Korpacz and the WPFL Board did not receive the details of the suspension until 33 days later.

60. In the correspondence received 33 days later, Vessey ordered that Plaintiff Korpacz immediately cease all operations of her team and hand over the reins to her General Manager. When Plaintiff Korpacz asked, Vessey refused to give Plaintiff Korpacz sufficient time to wind down certain affairs that were already scheduled and were pressing within her franchise, which she was obligated to attend in her capacity as owner.

61. Howington sent a request to Vessey asking that Vessey "grant permission to suspended New England Storm owner Missi Korpacz to make limited public appearances during the period of suspension." Vessey responded to Howington and agreed to only let Plaintiff Korpacz make those public appearances that were scheduled before the suspension. Vessey ordered that Plaintiff Korpacz was not permitted to speak to the press regarding her franchise as well.

62. In August 2003, season four of the WPFL began and during the 2003 season all of Howington's game tickets continued Plaintiff Korpacz' trademark and slogan "It's Our Turn to Play!" on them.

63. During the 2003 season at least Defendant VIXEN's merchandise contained Plaintiff Korpacz' trademark and slogan "It's Our Turn to Play!" on the back of said merchandise.

64. During the 2003 season, Plaintiff Korpacz complied with suspension and received no other disciplinary action(s) throughout the entire season.

65. During the 2003 WPFL Championship Game, all merchandise sold had Plaintiff Korpacz' trademark and slogan on the back "It's Our Turn to Play!" Plaintiff Korpacz did not approve having her trademark and slogan on the back of said merchandise.

66. On November 9, 2003, the semi-annual WPFL owner's meeting was held.

67. At this meeting, Vessey began a divisive campaign to destroy the WPFL structure and pit Associate Teams against Member Teams. Additionally, in advising WPFL owners on the legal structure of the three WPFL entities, Vessey overstepped her authority as Commissioner of the WPFL and actually acted as General Counsel to the league although she was never hired as such.

68. During that same meeting, with the understanding that the current league structure was still in place, and therefore Associate Team contracts would be renewed in one month's time, the WPFL Board voted new officers into position. Of the five Executive Officers that were voted in, four had Associate Team contracts, which were set to expire on December 31, 2003. These

contracts were never renewed. Accordingly, they were not authorized to hold Executive Offer positions beyond that date.

69. At the same meeting, one team was voted out and all others were offered renewal contracts.

70. At that same meeting a committee was appointed to review the WPFL relationship with WPFL Promotions and discuss a possible restructuring of the league.

71. At the conclusion of the November meeting, Plaintiff Korpacz left said meeting on good terms with no outstanding issues and/or charges against her.

73. Approximately three weeks later, Glass along with Plaintiff Korpacz, Kennamer and Howington and others as Founding Members agreed to and outlined a proposed restructure of the WPFL based upon the NFL structure.

74. According to the WPFL Bylaws, a unanimous vote was required to approve restructure of the league.

75. Plaintiff Korpacz made it very clear to all parties involved that she would not sign off on any proposed restructure until Vessey's arbitrary and capricious behavior towards Plaintiff Korpacz and her team was addressed by the WPFL Board of Directors.

76. In November 2003, Kennamer discovered that all documents relating to the WPFL, WPFL Promotions, and the WPFL Trust were missing from the WPFL office in Houston, Texas. Kennamer immediately notified Plaintiff Korpacz of this discovery. Plaintiff Korpacz immediately telephoned Vessey and both Kennamer and Plaintiff Korpacz informed Vessey of the missing WPFL documents.

77. Plaintiff Korpacz reported Vessey's actions and threats to various WPFL Board Officers. Plaintiff Korpacz received no response.

78. On January 22, 2004, Vessey informed the WPFL Board of Directors that the Florida

Stingrays License Agreement had been revoked.

79. Vessey stated that on or about November 11, 2003, these owners were notified in writing that some of the charges filed by Plaintiffs against the Florida Stingrays had been sustained in substantial part and that sanctions would be forthcoming." Per the WPFL Bylaws, Vessey never notified Plaintiff Korpacz in writing of the fine issued against the Florida Stingrays in a timely manner so as to appeal any decision by Vessey.

80. Unlike in the Plaintiffs' expulsions, as alleged herein below, upon revocation of the Florida Stingrays License Agreement, the WPFL issued no press release.  Additionally, the Florida Stingrays logo and team information remained on the WPFL website despite not being a team affiliated with the WPFL until the end of April 2004.

81. On January 22, 2004, Vessey issued a ruling with respect to the charges filed from Plaintiff Storm against the Florida Stingrays back in October 2003.  She conceded that her investigation was conducted within fifteen (15) days of receipt of the complaint, yet Vessey did not notify Plaintiff Korpacz that Florida had been fined until January 22, 2004.

82. In her ruling, Vessey sustained only 2 of 17 charges submitted by Plaintiff Korpacz. Only those allegations also alleged by Defendant DIAMONDS were sustained.   All other charges were ignored despite the clear and convincing evidence in support of them that was presented.  In correspondence issued to the WPFL Board regarding the ruling, Vessey issued defamatory statements regarding Plaintiff Korpacz when she stated "A separate ruling will follow to address the Stingrays' counter-complaint that Missi Korpacz misrepresented her identity to Continental Airlines for the purpose of causing unauthorized charges to be paid by Angela Belden's credit card."

83. On information and belief, the Florida Stingrays never submitted this issue as a counter-complaint against Plaintiff Korpacz, nor was a counter-complaint ever presented to Plaintiff Korpacz.

13

84. On January 22, 2004, Vessey issued more defamatory statements by issuing a "Demand To Show Cause" to the WPFL Board directing Founding Members to appear before the Board and testify as to why they should not be found to have violated their fiduciary duties as officers and employees of the League.

85. On January 22, 2004, Vessey issued a final ruling on a grievance filed by another Associate Team against the Florida Stingrays during the November owners meeting. In the above ruling, Vessey again issued derogatory and accusatory statements regarding Plaintiff Korpacz.

86. On January 22, 2004, Plaintiff Korpacz filed a grievance with the Board against Vessey for violation of the WPFL Bylaws and WPFL Mutual Respect Policy. To this date, Plaintiff Korpacz' above grievance against Vessey has never been heard despite repeated requests, as detailed below.

87. During a January 24, 2004 meeting, certain members of the WPFL Board voted with no legal basis to do so, to give one Board member up to $10,000.00 to retain an attorney for the only purpose of reviewing the proposed restructure of the WPFL. Plaintiff Korpacz never noted in favor of this. This constitutes illegal conversion of Plaintiffs' money

88. On January 30, 2004, Vessey filed a "Notice of Investigation" with the WPFL Board indicating that she was investigating Plaintiff Korpacz' alleged violation of her July 2003 suspension.

89. In her Notice of Investigation, Vessey alleged that Plaintiff Korpacz "deliberately and covertly" violated the terms of her July 9, 2003 suspension and that "at least one player has indicated a willingness to testify under oath as to Missi's violations of the terms of her suspension, and the enjoyment she displayed about defying the ruling." To date that player has never been identified or presented.

90. Plaintiff Korpacz requested identification of (1) the player's name, (2) how the player

14

came into contact with Vessey, and (3) the additional "probable cause" Vessey was referring to in her Notice of Investigation. Plaintiff Korpacz was and never has been responded to.

92. On February 1, 2004 Plaintiff Korpacz appealed Vessey's January 30, 2004 Ruling against Plaintiff Storm relating to a fine imposed by Vessey relating a merchandise matter.

92. On or about February 17, 2003, Vessey issued a "Report of Investigation" to the WPFL Board regarding Plaintiff Korpacz. This was meant to follow up her previous "Notice of Investigation."

93. In said "Report of Investigation", Vessey alleged "Specifically, first-hand witnesses have attested to the following: (1) that Missi Korpacz deliberately violated the terms of her July 9, 2003 suspension...and that immediate discipline is warranted, however, the seriousness of the proven misconduct -- in the context of several other (verbal complaints that have been reported to this Office but not yet investigated) -- strongly militates in favor of commencing Article VIII proceedings against Missi Korpacz and the New England Storm in order to provide due process to Missi and bring an end to the ongoing grumblings about this owner's past actions."

94. Vessey then called for an open calling of charges to be filed against Plaintiff Korpacz and Plaintiff Storm by stating "in the meantime, any other complaints about this owner or Team should be forwarded to the Executive Director or this Office as soon as possible, and no later than fifteen (15) days from this date."

95. In closing, Vessey stated that she "expressly authorizes Missi to attend and vote at the March board meeting (subject to disqualification on certain votes pursuant to Robert's Rules), notwithstanding this Office's determination that Missi has committed violations warranting immediate suspension. This privilege is extended in recognition of the undue burdens that would be placed on board members prior to the March meeting given Missi's record of appealing past disciplinary actions and her attendant efforts to discredit the authority of this Office."