UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND STORM, LLC., ) <br> MELISSA A. KORPACZ, JD ) <br>     Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> WOMEN'S PROFESSIONAL ) <br> FOOTBALL LEAGUE ("WPFL") et al ) <br> ) | CIVIL ACTION NO: 04-10735-RWZ |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR PRE-JUDGMENT ATTACHMENT**

Plaintiff Melissa A. Korpacz ("Korpacz") and Plaintiff New England Storm, LLC ("Storm") (hereinafter "Plaintiffs") respectfully submit this memorandum in support of their Motion for Pre-Judgment Attachment.

**I. INTRODUCTION**

Plaintiffs respectfully move this Court for an order attaching the Bank Accounts, Personal Property, Game Revenue and all right, title and interest in real estate standing in the names of all Defendants. An attachment is now necessary, reasonable and proper to provide security for the monetary judgment that Plaintiffs expect to recover. Although the prayer for relief in Plaintiffs' Amended Complaint in this action demands $1,300,000.00 as damages from Defendants, Plaintiffs at this time are only requesting an attachment of a reasonable amount of Defendants' assets, slightly more than $200,000.00, to compensate Plaintiffs for the revenue they have lost as a result of Defendants' unlawful conduct, as reflected in the attached Schedule C filings from Plaintiffs in 2001 and 2002, and other reasonable expenses, in the event that the Defendants either dissolve the WPFL or claim insolvency at the end of the 2004 season to avoid

1

paying a monetary judgment to Plaintiffs. *(See Exhibits 1 and 2 - Plaintiffs Profit and Loss, Schedule C Forms Detailing Revenue from 2001 and 2002)*

Plaintiffs have been forced to move for this pre-judgment attachment now because of recent inconsistent and contradictory representations made by Defendants regarding their ability to satisfy a monetary judgment. Specifically, on May 14, 2004, in their opposition to Plaintiffs' request for Temporary and Preliminary Injunctive Relief, Defendants represented to the Court, in an effort to convince the Court to deny such relief, that they have the financial wherewithal to make Plaintiffs whole on any monetary damage award that may be awarded. Defendants and their counsel have since made contradictory statements in conferences with Plaintiffs and Plaintiffs' counsel, and representations in a recent Joint Statement submitted to Plaintiffs for review, which indicate that their earlier representations to the Court about their financial wherewithal were not accurate. Moreover, new evidence has been uncovered with respect to Defendants' inability to pay should a judgment be entered against them, as well as their intent to avoid payment by dissolving or shifting assets once this season is over in less than ten weeks.

First, comments of Defendants' counsel during the Rule 26(f) conference between the parties on July 19, 2004 indicate that Defendants plan to dissolve the WPFL and dissipate any assets at the conclusion of the 2004 WPFL season, in an attempt to avoid satisfying any monetary judgment that may be awarded to Plaintiffs. *(See Exhibit 3 – Declaration of Melissa A. Korpacz)* Second, Defendants have represented in a recent Joint Statement pursuant to Federal Rule 16.1(a) that they have limited resources with which to conduct discovery in this proceeding. Plaintiffs believe that if a pre-judgment attachment is not granted, Defendants can and will attempt to avoid payment of any monetary judgment to Plaintiffs after the completion of a successful season, rendering this action effectively meaningless and fruitless. Finally, the public

2

administrative and financial turmoil in the WPFL, as outlined in greater detail below, leaves Plaintiffs to seriously question whether Defendants can sustain the 2004 season, and if they do, whether there will be funds available to satisfy a judgment if such funds are not now secured.

## II. ARGUMENT

It is well settled that Courts have inherent authority to grant pre-judgment attachments against the assets of defendants in order to secure payment of judgment under specific circumstances. Specifically, a person seeking a writ of attachment must demonstrate a reasonable likelihood of success on the merits of their claim. The Court may also take three additional factors into consideration when not dealing with attachments that are equitable in nature. *See Weaver v. Henderson*, 984 F.2d 11, 12 (1st Cir. 1993); *Aetna Cas. and Sur. Co. v. Rodco Autobody*, 138 F.R.D. 328 (D. Mass. 1991).

Once demonstrating a likelihood of success on the merits, the moving party must also demonstrate: (1) the potential that the Plaintiff will suffer irreparable harm if the attachment is not granted; (2) whether the Defendant will suffer a greater harm from the granting of the attachment; and (3) how the attachment would serve or disserve the public interest. *Id.*

Moreover, unlike the standard in seeking a preliminary injunction, the writ of attachment need not itself be related to that which underlies the cause of action, rather the purpose of an attachment is designed to ensure that a likely judgment will be satisfied. *Hasbro, Inc. v. Serafino*, 958 F.Supp. 19 (D. Mass. 1997).

Plaintiffs appreciate that the Court, in the denying their earlier requests for a TRO, indicated that Plaintiffs had failed to show to its satisfaction a sufficient likelihood of success on the merits of their claims to justify the entry of preliminary injunctive relief. However, given the new witnesses and evidence which have surfaced since that time, Plaintiffs believe it is now

apparent that they will likely succeed on most, if not all of their claims. Additionally, given the reasonableness of the amount of Plaintiffs' requested attachment, and the fact that it is likely that Defendants will not have the ability to pay Plaintiffs, a writ of attachment is proper in order to preserve Plaintiffs' right to monetary recovery once this Court has determined that Defendants' ongoing actions constitute an unlawful taking of Plaintiffs' Team, intellectual property, and other assets without compensation or the right to due process.

### III. IN ORDER TO PRESERVE PLAINITFFS' ABILITY TO RECOVER IN THE LIKELY EVENT OF JUDGMENT, IT IS NECESSARY FOR THIS COURT TO ISSUE AN ATTACHMENT NOW, WHILE THE DEFENDANTS HAVE ASSETS AND REVENUE.

A writ of attachment should issue now because the WPFL and Defendant Associate Teams have revenue now. Without an attachment, Defendants will otherwise be able to dissolve and dissipate the assets of the WPFL and change the names and/or purported affiliations of the Defendant Associate Teams at the conclusion of this season and avoid paying any monetary judgment to Plaintiffs.

Defendants argued during the May 14, 2004 appearance before this Court that Plaintiffs were entitled to no temporary or preliminary injunctive relief because Defendants could pay whatever money damages might be awarded in this case. It is now clear, however, that their representations at that time were not accurate.

Accordingly, Plaintiffs now ask for a reasonable attachment in the amount of $204,000.00. That amount should be assessed in the following manner: (1) against the funds of the WPFL in an amount no less than $75,000.00, $36,000.00 of which is based upon the revenue that was left over from last season when Plaintiffs were still lawfully affiliated with the WPFL and entitled to a portion of that revenue; and (2) against Defendant Associate Teams' incoming Home Game Revenue of the Defendant Associate Teams in the amount of $3,000.00 per home

4

game, per team for the remaining six weeks of the WPFL season. The total amount secured by Defendant Associate Teams would be approximately $129,000.00. Thus the total amount of the requested attachment would be $204,000.00 ($75,000.00 + $129,00000).

### A. New Witnesses and Evidence Support The Fact That Plaintiffs Are Likely To Succeed On The Merits In This Action.

New witnesses and evidence recently uncovered support the fact that Plaintiffs will likely prevail on most of, if not all of their claims alleged in considerable detail in their Amended Complaint. For example, Plaintiffs have attached hereto an affidavit from the marketing firm of Hill, Holiday located in Boston, Massachusetts, attesting to the fact that the concepts and slogans including the slogan "Its Our Turn To Play!" that Defendants continue to use without Plaintiffs' permission belong exclusively to no one other than Plaintiff Korpacz. *(See Exhibit 4 – Declaration of Martin Donohue, Creative Director, Hill Holiday, Boston, Massachusetts)*

Moreover, the attached exhibits support, as Plaintiffs alleged in their Amended Complaint, that the WPFL and several Associate Defendant Teams have and continue to use marketing materials, including slogans, logos, trademarks and other intellectual property, created for, distributed to and owned by Plaintiff Korpacz without her permission. The Defendant WPFL misappropriated this property, owned by Plaintiff Korpacz, and allowed Defendant Associate Teams to use and continue to use it without Plaintiff Korpacz' permission even after Plaintiffs' unlawful expulsion. *(See Exhibit 5 through 10 – Various Samples of Plaintiff Korpacz' Intellectual Property rights being used by Defendant WPFL and its Officers and/or Directors and other Defendant Associate Teams.)* Specifically, *(Exhibit 5 –Defendant Indiana Speed 2002 Poster Displaying Plaintiff Korpacz' Slogan "It's Our Turn To Play!"); (Exhibit 6 – Defendant Houston Energy 2003 Game Ticket Displaying Plaintiff Korpacz' Slogan "It's Our Turn To Play!"); (Exhibit 7 – Defendant Minnesota Vixen 2003 Merchandise Displaying*

5

*Plaintiff Korpacz' Slogan "It's Our Turn To Play!"); (Exhibit 8 – Defendant WPFL Officer Lisa Vessey Various Correspondences Displaying Plaintiff Korpacz' Slogan "It's Our Turn To Play!"); (Exhibit 9 – Defendant WPFL Web Site on March 10, 2004 Displaying Plaintiff Korpacz' Slogan "It's Our Turn To Play!") and (Exhibit 10 – Defendant WPFL Website on August 18, 2004 Displaying Plaintiff Korpacz' Slogan "It's Our Turn To Play!")*

Since Plaintiffs' unlawful expulsion, Defendant WPFL and Defendant Associate Teams have used and continue to use Plaintiff Korpacz' intellectual property on the WPFL website, in the operation of the WPFL, in representations to the public and the media and the various teams without Plaintiff Korpacz' authorization or permission. Ironically, although Defendants complain in their answer to Plaintiffs' Amended Complaint that it is Plaintiffs that are portraying to the public a misleading fact that they are still affiliated with the WPFL, to the contrary, it is Defendants' own behavior and actions with their continued use of Plaintiff Korpacz' intellectual property which truly conveys the misleading commercial impression to the public and the media that such continued use and reference is approved by, sponsored by or somehow affiliated or connected with the Plaintiffs. *(See Exhibit 11 – 16 Representations by Defendant WPFL and/or Defendant Associate Teams using and/or Quoting Plaintiff Korpacz' Slogan "It's Our Turn To Play!" in Connection with the WPFL) Specifically, (Exhibit 11 –September 3, 2003 Article in the Hamilton College Newspaper Referring to Defendant WPFL Website and the Slogan which appears said Website - "It's Our Turn To Play!"; (Exhibit 12 – College Website Noting the WPFL Website and Plaintiff Korpacz' Slogan "It's Our Turn To Play!" Also Linking to the Defendant Dallas Diamonds); (Exhibit 13 – April 5, 2004 Women's Calendar of Events Referring to Houston, TX and the Defendant WPFL Website and using the Slogan "It's Our Turn To Play!"); (Exhibit 14 – Guest Book of the Chicago Force Women's Football. A Player on*

6

*Defendant Minnesota Vixen Referring to the Defendant WPFL and closing with the statement "It's Our Turn To Play!"; (Exhibit 15 – July 28, 2004, Sparkweekly.com Listing the Defendant WPFL Motto as "It's our Turn!") and (Exhibit 16 – Dave Campbell's Q & A With the Dallas Diamonds, Page 3 Refers to the Slogan "It's Our Turn To Play!")*

More compelling is the fact that the WPFL has continued to prominently display intellectual property created for and owned by Plaintiff Korpacz on the WPFL website such as, Plaintiff Korpacz' slogan "It's Our Turn To Play!" and photographs taken by the New England Storm franchise without Plaintiffs permission. *(See Exhibits 17 & 18, Defendant WPFL Website Displaying Plaintiff Storm players and Plaintiff Korpacz' Intellectual Property Rights)* *Specifically, (Exhibit 17 – Display of Plaintiff Storm Player in middle Photograph); (Exhibit 17 – Display of Plaintiff Korpacz' Slogan "It's our Turn To Play!"); and (Exhibit 18 – Display of Plaintiffs Photograph of Officials with Their Hands in an Upward Motion from Plaintiffs 2000 Playoff Game in Daytona Beach, Florida. Defendant WPFL Also Displaying Plaintiff Korpacz' Slogan "It's Our Turn To Play!")* The continued use of Plaintiff Korpacz' aforementioned intellectual property and the visual display on their website and use of the same throughout the operations of the WPFL by Defendants is not only causing Plaintiffs to lose revenue, but such acts of Defendants constitute false designations of origin and affiliation in violation of section 43(a) of the Lanham Act, 15 U.S.C sec. 1125(a).

To further support Plaintiffs' likelihood of success on the merits, the affidavits which have accompanied Plaintiffs' various earlier Motions and Memoranda show that it is likely that Plaintiffs will establish at trial that the WPFL and certain Defendant Associate Teams did in fact collude to unlawfully and improperly expel Plaintiffs from the WPFL, a league of which Plaintiff Korpacz is a Founding Member, one-third owner, and in which Plaintiff Storm is a Founding

7

Member Team. *(See Exhibit 19 – Declaration of Dawn Sisler Regarding Improper Collusion to Ride the WPFL of Plaintiff Korpacz as Early as September 2003)* It is apparent that the expulsion of Plaintiff Korpacz and other Founding Members of the WPFL was nothing more than a smoke screen created to implement a hidden agenda of the WPFL Executive Officers and several Defendant Associate Teams to restructure the WPFL over the objections of two of the three Founding Members and three of the four Member Teams. This was done so that the Defendant Associate Teams would be granted the same/equal recognition and monetary status as the Founding Members and Member Teams regardless of the Defendant Associate Teams longevity or the extent of their financial investment in the league. Nevertheless, this was carried out by individuals who had contracts which expired on December 31, 2003 and were never renewed, yet they still continued and continue to represent themselves as the WPFL and they WPFL Board of Directors, along with a former Commissioner who was lawfully terminated by WPFL Member Teams who at the time of Plaintiffs unlawful expulsion were the only teams with valid executed contracts with the WPFL thereby granting them the only valid, legal authority to act on behalf of the WPFL.

### B. WPFL Is A Non-Profit Entity That Will Not Have The Ability To Pay And Defendant Associate Teams Will Also Not Have The Ability To Pay After This Season Is Concluded.

The WPFL, as a non-profit entity, ended the 2003 season with no more than $36,918.28 in its bank account. *(See Exhibit 20 – 2003 WPFL Profit and Loss Sheet)* Also, the WPFL only receives money once a year on May 1st when teams pay their license fee for the upcoming season to enter the WPFL. *(See Exhibit 21 – Page 1, 2003 WPFL Profit and Loss Detail Sheet – Associate Teams and Member Teams Deposits Section, Amounting to $82,000.00 for the season)*; other than the May 1st license fee payment, very little revenue is generated by the WPFL except

8

for minor fines from the teams. *(See Exhibit 21 – Page 1, 2003 WPFL Profit and Loss Detail Sheet – WPFL Fines Section, Amounting to $3,165.00 for the season)*. So in all actuality with respect to this suit, the WPFL will receive no additional funds until May of 2005 provided that it is still in existence at that time. Therefore making it virtually impossible for Defendants to assure revenue in order to continue to defend this lawsuit or more important to Plaintiffs when and if a judgment is secured.

The Defendant Associate Teams also only generate funds a short time during the year. The window of opportunity for any team to generate funds is during their three-month season. Once the WPFL season is over, those Defendant Associate Teams are under no additional obligation to pay the WPFL any funds until May 1st of the following year. Therefore, once this lawsuit is complete and when or if a judgment is rendered in favor of Plaintiffs, there will be virtually no way for Defendant WPFL to demand payment from the Defendant Associate Teams for to continue to defend this lawsuit or to compensate Plaintiffs in monetary damages should Plaintiffs win, based upon what remaining revenue may be left in the WPFL at the conclusion of this season and the lack of revenue generating from the Defendant Associate Teams.

Accordingly, it is proper and necessary to attach the funds of the WPFL in an amount of no less than $75,000.00, and the incoming Game Revenue of the Defendant Associate Teams in the amount of $129,000.00 ($3,000.00 per home game for the remaining six weeks). As noted above, the total amount secured would be approximately $204,000.00 to be applied towards a possible judgment for Plaintiffs.

### C. All Money In The WPFL, Including Any Previous 2003 Profit Of Which A Portion Belonged To Plaintiffs, Have Been And Continue To Be Consumed By Defendants.

According to the 2003 WPFL Profit and Loss statement, the WPFL concluded its season with approximately $36,000.00. *(See Attachment 20 – 2003 Profit and Loss Statement)* Since Plaintiffs were lawfully affiliated with the WPFL, a Founding Member and 1/3 owner at the time that money was generated up until the conclusion of the 2003 season, a portion of that money belongs to Plaintiffs. Upon information and belief, Defendants have spent all of the 2003 revenue that was left over that Plaintiffs were entitled to in order to defend this action. *(See Exhibit 3 - Declaration of Melissa A. Korpacz)*. Some Defendant Associate Teams who are benefiting from that money were not even part of the WPFL last season when that money was generated, namely, the New York Dazzle, Missouri Avengers, and Delaware Griffins. Additionally, upon information and belief, a majority of Defendant Associate Team fees which have been paid into the WPFL for this season which is meant to guarantee teams that the WPFL will pay for Play-Off Games, Championship Games and Championship Rings, has also been spent to defend this action. *(See Exhibit 21 – Page 3 & 4, 2003 WPFL Profit and Loss Detail Sheet – Payment to WPFL Promotions for Play-Off Games, Championship Games and Ring Company)*. Accordingly, when all is said and done, even if at a minimum the amount left over was the $36,000.00 prior to Plaintiffs' unlawful expulsion, it is gone and at the rate the Defendants are spending money now, there will be nothing left to make the Plaintiffs' whole with respect to past estimated lost revenue.

### D. <u>WPFL Has Now Displayed Evidence Of Financial Strain And Internal Turmoil.</u>

1. <u>Internal Turmoil</u>

Uncertainty and instability in the WPFL since Plaintiffs' unlawful expulsion as detailed below, further supports the issuance of a pre-judgment attachment against Defendants in order to preserve Plaintiffs' rights to recovery.

The recent internal turmoil began within the WPFL prior to this season's 2004 kick-off with upon information and belief the removal of Beth Markell as Executive Director for allegedly failing to perform her duties. *(See Exhibit 3 – Declaration of Melissa Korpacz).*

The second indication of internal turmoil within the WPFL surfaced when, upon information and belief, Charlene Daniels as the Secretary of the WPFL was removed from office and then came with the resignation of the Associate Executive Director due to her dissatisfaction with the WPFL. In all, within a matter of two months, three of the five Executive Offices within the WPFL have either resigned or been removed from office. *(See Exhibit 3 – Declaration of Melissa Korpacz).*

Another example of instability came when Robin Howington, the only remaining WPFL Founding Member and owner of Defendant Houston Energy sold her team purportedly due to her dissatisfaction with the way the WPFL was being run. *(See Exhibit 3 – Declaration of Melissa Korpacz)* Ironically, that now leaves no Founding Members with the WPFL after four years of endless hours of work and effort on their part. Moreover, since the unlawful expulsion of the Plaintiffs, three Defendant Associate Teams faced public humiliation and created embarrassment for the WPFL because: (1) the Dayton Rebellion resigned from the WPFL prior to the season *(See Exhibit 22 – Listing of current WPFL Teams);* yet, this Defendant Associate Team was able to vote on Plaintiffs' unlawful expulsion in March 2004 and pay money to the WPFL or execute

a 2004 contract; (2) the Missouri Avengers faced financial and internal failure as demonstrated in their inability to host WPFL Home Games and limited participation in the 2004 WPFL season by playing away games only in those host team venues that would fly the Missouri Avengers to them and pay all the expenses; and (3) the lack of players and the inability of the Defendant Syracuse Sting to field a team with only 18 players. *(See Exhibit 3 – Declaration of Melissa Korpacz)*.

In 2001, when the Founding Members created the WPFL, it started the WPFL with only four teams. The following year in 2002, the Founding Members were able to increase the league size to eight teams and in 2003 they were able to produce 18 teams in the WPFL. The WPFL is now down to 11 non-exhibition teams. *(See Exhibit 22 – Listing of current WPFL Teams)*. Never in the history of the WPFL had the Founding Members decreased in size and/or faced the administrative turmoil that the WPFL is facing now since Defendants have unlawfully expelled Plaintiffs and the remaining two Founding Members are also no longer with the league. Plaintiffs' fear is that the Defendants are destroying the WPFL and they will not make it through the remainder of the 2004 season, or if they do, Defendants will dissolve and attempt to render themselves judgment proof.

2. Financial Instability

Upon entering the WPFL since its existence and including this season all incoming teams are promised at minimum three things in exchange for their license fee: (1) they will have the play-off games paid for by the WPFL; (2) the Championship Game will be paid for by the WPFL and (3) the winner of the Championship Game will receive Championship Rings and the WPFL will pay $15,000.00 towards those rings. A telling sign of the financial instability of the came when the Officers of the WPFL, after accepting the incoming teams for the current season and

taking their money, issued the 2004 budget which indicated that there would be no WPFL Championship Rings provided this season. *(See Exhibit 3 – Declaration of Melissa Korpacz).* Another sign of the financial instability of the WPFL came when Defendants were told that they would have to assist financially with the WPFL Play-off Games and most recently possibly assisting financially with the Championship Game. *(See Exhibit 3 – Declaration of Melissa Korpacz).* Based upon the aforementioned turmoil and instability which has taken place in the short time since Plaintiffs' unlawful expulsion, it is clear that an attachment in order to preserve Plaintiffs rights is now proper and necessary.

### E. The Amount Plaintiffs Seek To Attach Is Not Greater To The Amount Of What Plaintiffs Expect To Recover.

As stated previously, although Plaintiffs' prayer for relief in their Amended Complaint indicates an amount of $1,300,000.00, Plaintiffs respectfully request that the amount to be attached be no more than $204,000.00 in order to compensate Plaintiffs for lost revenue as reflected in the attached Schedule C filings from Plaintiffs in 2001 and 2002 and other reasonable damages attributed to their unlawful expulsion from the WPFL. Plaintiffs submit that the amount requested is entirely reasonable under the circumstances. As such, the amount that Plaintiffs are seeking to attach is not entirely burdensome on Defendants, but gives Plaintiffs some peace of mind in that there will be some secured revenue in the event of a favorable judgment. Because of the consequences of the Defendants' becoming judgment proof, the balance of potential hardships tips decidedly in favor of granting the requested attachment.

## IV. CONCLUSION

For all of the foregoing reasons, Plaintiffs' Motion Pre-Judgment Attachment should be granted.

Respectfully submitted,

Plaintiff Melissa Korpacz

Dated: September 2, 2004

*/s/ Melissa A. Korpacz*

Melissa A. Korpacz. - Pro Se
P.O. Box 808 Medford, MA 02155
781-866-9700 (phone)

Plaintiff New England Storm, LLC
By its Attorneys,

*/s/ Thomas C. O'Konski*

Thomas C. O'Konski BBO# 377475
Kevin Gannon BBO# 640931
Cesari and McKenna, LLP
88 Black Falcon Avenue
Boston, MA 02210
617-951-2500 (phone)
617-951-3927 (fax)

### CERTIFICATE OF SERVICE

I hereby certify that I caused a true copy of the above document to be served upon the attorney of record for each other party by facsimile and first class mail on September 2, 2004:

Brian D. Gross
COOLEY MANION JONES LLP
21 Custom House Street
Boston, MA 02110

Carlton D. Wilde, Jr.
FRANKLIN, CALDWELL & JONES, PC
1001 McKinney, 18th Floor
Houston, TX 77002

*/s/ Melissa A. Korpacz*