UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION
NO: 04-10735-RWZ

NEW ENGLAND STORM, LLC., )
MELISSA A. KORPACZ, JD )
    Plaintiffs, )
)
v. )
)
WOMEN'S PROFESSIONAL )
FOOTBALL LEAGUE ("WPFL") et al )
)

**DECLARATION OF DEE A. KENNAMER IN SUPPORT OF PLAINTIFF KORPACZ' REQUEST FOR RECONSIDERATION OF HER MOTION FOR EMERGENCY TEMPORARY RESTRAINING ORDER**

I, Dee A. Kennamer, do hereby declare and state that the following is based upon my own personal knowledge and I believe all of my statements to be true, except where based upon information and belief, and as to those statements, I am informed and believe them to be true.

1. I submit this Declaration in support of the Plaintiff Melissa Korpacz ("Ms. Korpacz") Request for Reconsideration of her Motion for Emergency Temporary Restraining Order against the WPFL pending the outcome of this litigation.

2. I am a minority interest holder in the Austin Rage, LLC, a Founding Member Team License holder of the Women's Professional Football League.

3. I am a co-founder, along with Ms. Korpacz and Robin D. Howington of the Women's Professional Football League, a Texas not-for-profit corporation ("WPFL"); WPFL Promotions, LLC, a Texas Limited Liability Company ("WPFL Promotions"); and The WPFL Irrevocable Trust, a trust ("the Trust"). These entities were created in January 2002.

4. To date two of the three Founders' MemberTeams have been ousted and/or expelled from the WPFL in direct violation of the policies and procedures delineated in the WPFL By-laws, and consequently Ms. Korpacz and Donna M. Roebuck were improperly removed from the Board of Directors.

5. My business partner and co-owner of the Austin Rage, Donna M. Roebuck, attended the November meeting. Ms. Roebuck informed me that there was no "extension of Associate Team contracts", as alleged in Defendants' Opposition. There was a vote to offer Associate Teams, with exception of the San Diego SunFire contracts for the 2004 season, but the discussion concluded with a postponement of signing new contracts until a proposed restructuring was presented. In my opinion, that was a rejection of the offer of a 2004 contract. In other words the basic elements of a contract: offer, acceptance and consideration do not exist. It is my opinion that the offer to renew the contracts would be an offer to renew the contracts exactly as they were written for the 2003 season.

6. Most of the WPFL Teams are Associate Teams and as such do not have any interest in WPFL Promotions. On or about November 2003 several of the Associate Teams indicated that they were unhappy with the contract between WPFL and WPFL Promotions.

7. The Associate Teams have each been given the opportunity to become Member Teams, which would grant them such an interest in WPFL Promotions.

8. Associate Team License Agreements grant a team an opportunity to participate in the WPFL at an associate level. Associate teams are not required to pay an initiation fee and have similar but lesser rights than Member Teams. Distinctions

are made in the By-laws between Member Teams and Associate Teams and additionally the rights are delineated in the Team licenses. Beneficiaries as defined in the Trust document exclude Associate Teams. All that is required for an Associate Team to become a Member Team is payment of the Initiation fee in the approved fashion and signing of a new Member License. It is important to note also that interested parties could acquire interest directly in WPFL Promotions by becoming a Member of WPFL Promotions, not to be confused with a Member Team in the WPFL.

9. It is obvious to me that the Associate Teams did not want to incur the same financial burden as the three Founders and the owners of the Arizona Knighthawks to become Member Teams.

10. All teams are required to pay an annual license fee. The Board of Directors annually determines the required amount. The proceeds are used to finance the administration of the league and to fund the playoffs and championship games.

11. According to the WPFL By-laws, which I drafted, a unanimous vote is required to change any article of the By-laws that references the agreement between WPFL and WPFL Promotions. It is my belief that expelling the New England Storm and the Austin Rage from the WPFL was a means of achieving the inappropriate and unlawful goal of restructuring the WPFL and revoking the contract with WPFL Promotions.

12. Ms. Korpacz was the most outspoken with respect to her refusal to agree to a restructure of the WPFL unless she was treated fairly by Commissioner Vessey.

Additionally, I believe that Plaintiffs' rights have been violated based on the following points:

i. I was present during a telephone conference in which then Commissioner Vessey unlawfully and improperly issued a set of demands upon Plaintiffs Korpacz and the New England Storm immediately prior to the releasing of the 2003 schedule.

ii. Prior to that conference between the Commissioners, Ms. Korpacz and myself, it was the initial intention of Commissioner Vessey as stated to me, to suspend "indefinitely" Plaintiffs Korpacz and the New England Storm. I objected to the entire illegal procedure. Commissioner Vessey was denying Plaintiffs their rights granted per the WPFL By-laws, specifically the required notice and appeals process. Please refer to Article V Section 4 of the By-Laws referring to an action initiated by the Commissioner. The procedure is slightly different than an Article 8 action.

iii. After much convincing by me, Commissioner Vessey finally agreed to suspend only Ms. Korpacz for four games but would allow her team to play. This was a last ditch effort on my part to prevent the indefinite suspension of the entire New England Storm team. During the telephone conference Commissioner Vessey issued Ms. Korpacz several ultimatums and told Ms. Korpacz she had 48 hours to comply with a list of demands, otherwise the 2004 schedule would be released without the New England Storm on it. Ms. Korpacz was not given

proper notice or an opportunity to appeal as provided in the By-laws, but was simply placed in a position where she had to comply with Commissioner Vessey's verbal notice of the demands to prevent the schedule from issuing without the New England Storm. Verbal notice is not sufficient per the WPFL By-laws Article XIX.

iv. One of the demands Commissioner Vessey set forth was that Ms. Korpacz had to place $4,000.00 in a WPFL escrow account in order to ensure that the New England Storm appeared for all the 2003 games. A WPFL Team had never been required to do this before, and the WPFL Board did not formally approve Ms. Vessey's demands to Ms. Korpacz. Additionally, the New England Storm had already been issued a $10,000.00 fine for failing to show for the Syracuse Sting game in 2002 and they satisfied that obligation. Ms. Korpacz complied with Commissioner Vessey's demands and wired the $4,000.00 into the WPFL bank account, in hopes of avoiding indefinite suspension.

v. In her ruling on Ms. Korpacz' suspension Commissioner Vessey indicated that "<u>due to a pattern of misconduct</u>" Ms. Korpacz was being suspended. However, no evidence of such alleged misconduct was ever submitted to the Commissioner, other than verbal complaints. Ms. Korpacz was never allowed to appeal the suspension. Ms. Korpacz was threatened that if she did appeal, the schedule would be released without her team on it.

vi. At the time of the suspension, Commissioner Vessey had only been in office for a short period of time, had never met Ms. Korpacz and was operating based on hearsay. To my knowledge, she possessed no evidence to support the allegations. I believe that a few individual team owners were unhappy because the three Founding Teams had a bigger piece of the pie than they did and simply disliked Ms. Korpacz and wanted to "get rid of her. As such, they were pushing Commissioner Vessey to take action.

vii. In violation of WPFL Bylaws, Ms. Korpacz did not receive proper notice of any charges, proper notice of investigation, proper opportunity to respond to charges, or proper notice of the ruling by Commissioner Vessey and most importantly an opportunity to appeal the ruling as required or provided in the WPFL By-laws.

viii. As the author of the WPFL By-laws, it is my opinion that Commissioner Vessey acted outside of the scope of her authority as Commissioner in suspending Ms. Korpacz and ignored certain rights and protections afforded to all team owners and license holders within the WPFL.

ix. Upon receiving the four game suspensions, Commissioner Vessey demanded that Ms. Korpacz immediately cease any and all contact with her team until four games had passed. This ultimately ended up being in reality a three-month suspension of Ms. Korpacz as her fourth game was at the end of August.

13. Ms. Korpacz to the best of my knowledge and belief substantially complied with the aforementioned suspension.

14. Ms. Korpacz and Plaintiff Storm completed the entire 2003 season and to my knowledge received no fines and had no charges or grievances filed against them with exception of a minor $50.00 fine for failure to have TV numbers on away jerseys.

15. I was not present at the semi-annual owners meeting in November 2003, however, my business partner and co-owner of the Austin Rage; Donna Roebuck was present at the November meeting and informs me that Plaintiffs left the meeting in good standing.

16. Upon returning from the November 2003 annual meeting, Ms. Korpacz contacted me and relayed the "issues" that the Associate Teams were having with WPFL Promotions and the need for change. Most of the Teams are Associate Teams and as such do not have any interest in Promotions. Ms. Korpacz and I decided that since Robin Howington had been carrying such a large load of responsibilities, she should no longer be President of WPFL Promotions and we elected new officers and sought resumes for volunteers or interns to assist with some of our new objectives.

17. As author of the Associate Team contracts, I believe that on December 31, 2003 most of the Associate Team contracts expired. To the best of my knowledge these contracts have not been renewed. The WPFL Board voted to renew all team contracts, but the teams decided to wait until the proposed restructure was complete. As a result, the Associate Teams rejected the league's offer to renew

the Associate Team contracts for an additional year, and therefore the basic elements of a contract (offer, acceptance, and consideration) do not exist.

18. Pursuant to the Bylaws, only teams with current valid license agreements are authorized to appoint a Director to the Board. Therefore, it is my belief that only New England, Houston, Austin and Arizona (Knighthawks), and arguably the New York (Dazzles) had authority to retain Director positions subsequent to December 31, 2003.

19. All Officers of the WPFL, with exception of the Commissioner, are required to be Directors or Alternate Directors. Therefore the entire slate of officers elected at the November 2003 meeting with the exception of Robin Howington (owner of Houston) are unlawfully and improperly holding themselves as Officers of the WPFL.

20. In January 2004, two important things happened which I believe was the ultimate motivation to have the Plaintiffs expelled from the league.

21. The now former Associate Teams wanted to discuss a proposed restructure prior to signing a new contract with the WPFL for the 2004 season. The former Associate Teams indicated that they wanted to be in positions substantially more equal to that of the Founders and the Member Teams.

22. The former Associate Teams were extremely unhappy with the performance of WPFL Promotions over the past two years. Accordingly, Ms. Korpacz and myself as two of the three managing members in WPFL Promotions voted to change the operating officers and add positions to the organization to make it

more successful and to attempt to provide what the Associate Teams were requesting at the November meeting.

23. Ms. Korpacz indicated that she would not agree to a restructure unless the Board gave Commissioner Vessey a directive, including guidelines to follow and a mandate to treat all teams justly, consistently, and according to the By-laws. Ms. Korpacz' vote in essence would have blocked any restructure.

24. On January 22, 2004 Commissioner Vessey issued three Rulings all of which made derogatory references toward Ms. Korpacz, individually. This was pattern that Commissioner Vessey had developed.

25. On January 23, 2004 Ms. Korpacz filed a grievance with the Board of Directors against Commissioner Vessey. To date it is my understanding that no Officer has ever acknowledged or responded to these grievances regarding Commissioner Vessey's ongoing abuse of Ms. Korpacz and her team. These grievances were filed prior to the Commissioner's call for an Article VIII hearing on Ms. Korpacz and the New England Storm.

26. In early February Commissioner Vessey issued a Report of Investigation, which stated that she had clear and convincing evidence that Ms. Korpacz had violated her suspension, back in July of 2003, some nine months prior.

27. To date I have never seen that clear and convincing evidence or received the evidence packet to prove that Ms. Korpacz violated her suspension. This evidence packet was promised to all teams back in February 2004.

28. I spoke to Ms. Korpacz on the evening of each of her home games of which she was suspended. It is my belief I was speaking to her from her home. I recall one

such incident when she received word from her General Manager that one of her players was rushed to the hospital with a spinal injury. Rather than violate her suspension, Ms. Korpacz placed a call to Commissioner Vessey to receive permission to visit her player in the hospital. It is my understanding that Commissioner Vessey refused to allow Ms. Korpacz as owner of her team to visit the injured player. In a later conversation with Robin Howington both she and I discussed the fact that Ms. Korpacz should have been allowed to visit the hospitalized player and that Commissioner Vessey was out of line in refusing such a reasonable request.

29. In Commissioner Vessey's Report of Investigation to the Board, she indicated that any team that had a grievance against Plaintiffs should file said grievances within fifteen days.

30. I believe that Commissioner Vessey has also issued rulings against the Austin Rage that are in violation of the procedures delineated in the By-laws. I believe her behavior to be disrespectful, rude, unprofessional and absolutely not in the best interest of this sport or this league. The idea was for the WPFL to be run by a Board, which consists of one voting representative from each franchise. We never intended to have a dictator. The rulings against the Austin Rage are presented as evidence for the court to consideration that the actions by the Commissioner are inappropriate and in violation of the By-Laws and for no other purpose. The Austin Rage at this time does not plan to participate any further in the WPFL due to the failure of the Commissioner and the Board to follow the By-Laws and the original agreements.

31. On February 23, 2004 Commissioner Vessey issued an Article VIII Hearing against Plaintiffs because four teams had filed charges against Ms. Korpacz upon the open call for charges issued by the Commissioner. Three of the charging teams have not played the Storm in two seasons and a majority of the charges were prior to the 2003 season and dated as far back as 2000. The WPFL organization was not even established until January 2002. These teams joined the league subsequent to some of the actions for which they filed charges. If they were so disturbed by the actions, why did they join a league in which Plaintiffs were an integral component?

32. Commissioner Vessey barred Ms. Korpacz from attending any WPFL Board meetings and/or voting on any Board matters. The By-laws allow only for teams "not in good standing" to have their voting rights suspended. Good standing is defined as a Team not more than $2,500.00 in arrears to the WPFL. Plaintiffs were in good standing.

33. During the time frame from January 2004 until their expulsion in March of 2004 Ms. Korpacz sent emails to fellow Board Members seeking help and protection from the abusive behavior to which they were being subjected at the hands of Commissioner Vessey. Those individuals who were representing themselves as the Executive Director, Beth Markell and Associate Executive, Jennifer Cada simply ignored Ms. Korpacz' requests. To my knowledge no action was ever taken in response to Plaintiffs charges against the Commissioner.

34. I was present on a conference call on March 3, 2004, during which a majority of the Member Teams was present (New England Storm, Austin Rage, and the

Arizona Knighthawks). Also present on the conference call were the owner of the Northern Ice, a co-owner of the So Cal Scorpions and Shannon Frison, an Attorney from Dwyer and Collora. During this conference call the majority of the Member Teams asked for legal advise from Attorney Frison as to the status of the Associate Teams, Member Teams, etc. Advice was rendered that the Member Teams were the only teams with valid, legally executed contracts and therefore were the only teams with Directors who had a legal basis to conduct business on behalf of the WPFL. With that information, the Member Team owners on the conference call voted to hire Attorney Frison as General Counsel for the WPFL and instructed her that her first order of business was to terminate the services of Ms. Vessey as Commissioner of the WPFL.

35. Attorney Frison informed Ms. Vessey by letter that she was relieved of her duties and that her presence would not be required at the upcoming March semi-annual owners meeting. Vessey ignored the termination and to date continues to represent herself as the WPFL Commissioner despite being legally terminated.

36. On March 6, 2004, Ms. Vessey, over the objection of myself, Ms. Korpacz and Rufino Uribe, owner of fellow Member Team Arizona Knighthawks, ignored the request of the majority Member Team owners to remove herself from the Boardroom and continued to act as the Chairperson of the WPFL Board Meeting. The Member Teams noted remained in the meeting in an effort to protect our rights as Teams to participate in the business of the WPFL.

37. Ms. Korpacz' voting rights were not reinstated per her request and argument that she was in good standing according to the WPFL Bylaws.

38. Austin Rage voting rights were reinstated but I believe only because we arrived with a letter from our attorney demanding that the Board begin operating according to the By-laws or be subject to litigation.

39. In a humiliating, derogatory, hostile hearing Ms. Korpacz was ordered to respond to each and every allegation against her with a guilty or not guilty response. At one point I broke down due to how they were treating Ms. Korpacz and had to remove myself from the room in order to regain my composure.

40. Although I have repeatedly asked, I have never been provided with any evidence except the somewhat suspect and hearsay testimony of some of the Defendants and/or others at the March meeting.

41. Additionally, some of the charging parties have committed the exact same acts that Plaintiffs were accused of committing, but no action has been taken against them and they still remain in the WPFL.

42. Regarding some of the charges Plaintiffs were found guilty of, Plaintiffs had evidence and/or documentation to rebut the hearsay allegations. However, Ms. Korpacz was not allowed the due process provided in the By-laws, Roberts Rules of Order or the laws of this country. Plaintiffs were allowed no cross-examination or to present any document evidence and had only a few minutes to submit verbal testimony. Ms. Korpacz was not allowed to speak during the Penalty Phase at all.

43. My belief of the aforementioned is based upon and supported by my creating the WPFL Bylaws and knowledge as a Founding Member and the facts set forth below.

44. When the Founders created the WPFL, I served as the Director of Football Operations, and Treasurer for the WPFL and WPFL Promotions from January 2002 until December 2003. I also served as Secretary during the establishment of the entities and through November 2002.

45. I personally created the items entitled Women's Professional Football League Organization Agreement; Articles of Incorporation, Assumed Name Certificate and Women's Professional Football League Constitution and By-laws (hereinafter By-Laws) for the WPFL; Articles of Organization and Operating Agreement for WPFL Promotions; and The WPFL Irrevocable Trust document for the Trust. (See Plaintiffs' Exhibits 1-4) The Founders' intentions are clearly delineated in the Organization Agreement.

46. On January 17, 2002 via conference call, the Founders ratified all of the aforementioned documents during the organizational meeting, the initial Board of Directors meeting, and Managers meeting, respectively. Minutes of said meetings were reduced to writing and became part of the appropriate official corporate and company records.

47. The signatures of the three Founders were secured on the Organization Agreement and the By-laws on March 8, 2002, upon Ms. Korpacz' first trip to Houston, Texas subsequent to the January 17th conference call. Upon my last trip to the league office the Operating Agreement and the Trust Document were not in the appropriate records.

48. Shortly thereafter, the Founders approved purchase of the WPFL logo from Compass Design. The logo had been used by a predecessor entity, World Wide

Sports d/b/a WPFL, which had ceased to operate due to financial difficulties. The predecessor company had never paid the graphics company for the logo and the designer had regained its ownership. The designer, Compass Design, agreed to sell the logo to the new WPFL.

49. It was the Founders' intention for the WPFL to obtain a not-for profit status from the Internal Revenue Service. I completed the application and secured a determination letter granting the WPFL a 501(c)(6) exemption.

50. Since the WPFL was intended as a not-for-profit organization, the Founders intended WPFL Promotions to serve as the media and marketing arm of the WPFL and that company was to have an irrevocable contract with the WPFL, which could only be amended or repealed by unanimous vote of the WPFL Board of Directors.

51. Based upon the aforementioned facts that (49) the WPFL was created as a not-for-profit organization and (50) there was an irrevocable contract with WPFL Promotions, the three Founders placed all of their personal interests in the entity WPFL Promotions and in exchange each was issued 16.66% interest in WPFL Promotions granting the three Founders cumulatively a 50% interest position.

52. The Founders then granted 50% interest in WPFL Promotions to the Trust for the benefit of the Member Teams. The Founders named themselves as co-fiduciaries of the Trust.

53. I also drafted the Founding Member Team License Agreements and the pro-forma Member Team and Associate Team License Agreements to be used to delineate the agreement between the WPFL, WPFL Promotions and teams becoming

participants in the WPFL. Within each of those team licenses reference is made to the irrevocable contract between WPFL and WPFL Promotions. (See Plaintiffs Exhibits 5-7). Further clarification regarding the role of WPFL Promotions is also made in those documents and in the By-laws.

54. As additional consideration for the efforts of the Founders in creating and establishing the organizations, Founding Member Team Licenses were granted to each of New England Storm, LLC owned by Melissa A. Korpacz; Houston Energy Football, Inc. owned by Robin D. Howington; and Austin Rage, LLC owned in majority by Donna M. Roebuck and in minority by Dee A. Kennamer and others. Furthermore each of these teams was a participant in the original WPFL, which was established in 1999 and they were the only teams able to withstand the demise of that organization. I believe those teams were able to survive because of the significant financial and time investments of the referenced individuals. None of these three teams or individuals held any significant interest in the original WPFL.

55. Founding Member and Member Team License Agreements grant a team a lifetime membership in the WPFL and a protected territory. Consideration in the form of an initiation fee for Member Teams was originally set at $25,000.00 and to date has not been redetermined.

56. Associate Team License Agreements grant a team an opportunity to participate in the WPFL at an associate level. Associate teams are not required to pay an initiation fee and have similar but lesser rights than Member Teams. Distinctions are made in the By-laws between Member Teams and Associate Teams and

additionally the rights are delineated in the Team licenses. Beneficiaries as defined in the Trust document exclude Associate Teams. All that is required for an Associate Team to become a Member Team is payment of the Initiation fee in the approved fashion and signing of a new Member License. It is important to note also that interested parties could acquire interest directly in WPFL Promotions by becoming a Member of WPFL Promotions, not to be confused with a Member Team in the WPFL.

57. All teams are required to pay an annual license fee. The Board of Directors annually determines the required amount. The proceeds are used to finance the administration of the league and to fund the playoffs and championship games.

58. Plaintiff New England Storm, LLC was granted a perpetual Member Team License Agreement for Boston, Massachusetts and the surrounding 75 mile area; and has held that License Agreement since January 2002. It held a similar agreement with the predecessor entity from around April 2000 through that entity's failure.

59. Upon creation of the WPFL the three Founders had specific duties. Initially, Ms. Korpacz served as the Executive Director, and until March 2004 was an integral component of marketing and promotion on behalf of the WPFL.

60. The Founders devised the organization structure and provided the league logo and every related document, and policy and/or procedure that has been and continues to be used by the teams and related individuals now affiliated with the WPFL.

61. For the record, the Austin Rage voted against the expulsion of the Plaintiffs from the WPFL. We would like to reiterate, that the hearing should never have been

conducted with the participants that were allowed. It is still our contention that the only Teams with valid contracts as of today are New England Storm, Houston Energy, Austin Rage, Arizona Knighthawks and potentially New York Dazzle. We look forward to the courts review of these matters and appropriate resolution.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 3rd day of June 2004 at Houston, Texas.

Respectfully submitted,

_____
Dee A. Kennamer
WPFL Co-founder